GLADNEY, Judge.
This is an action to recover damages brought by the parents of twelve year old Rhett Matthew Plauche, who was killed in a fall from his horse. Negligence is the basis for the suit and made defendants are Russell Bourgeois, the driver of a truck, his employer Consolidated Companies, Incorporated, and its public liability insurer, The Travelers Insurance Company. After trial, judgment was rendered in favor of each of the plaintiffs and the defendants have appealed sus-pensively and devolutively.
The fatal accident which befell the boy occurred about eight o’clock on the morning of July 7, 1954. At the time Rhett and his older brother, Winnfield, were riding their horses over the Simmesport bridge which spans the Atchafalaya River and connects Avoyelles and Point Coupee Parishes. Simmesport in Avoyelles Parish is situated at the west end of the bridge. The two boys were on their way to Point Coupee Parish for the purpose of pasturing their horses. Simultaneously, Russell Bourgeois was driving a motor truck with trailer van attached, the property of Consolidated Companies, Incorporated, in the direction of Mansura, a town located in Avoyelles Parish. The truck and the horses met at a point about three hundred thirty-nine (339') feet from the western end of the bridge. It was near this point that Rhett’s horse became frightened and reared up causing its rider to fall and receive injuries from which death ensued almost instantly.
In support of their stated cause of action, plaintiffs allege the proximate cause of the accident is attributable to the negligence of Russell Bourgeois in three particulars :
First, he saw or should have seen that petitioners’ two sons were riding horseback and advancing in his direction on a long and narrow bridge, which imposed on him the duty of bringing his truck to a complete halt and await the passage of said horses before proceeding; secondly, he drove his truck trailer within close proximity to said horses and there suddenly applied his brakes and released them, causing a sudden hissing sound which frightened the horses; and thirdly, seeing the two horses had become frightened and excited and were prancing about on a narrow bridge, should not have proceeded with the movement of said truck trailer, leaving only a narrow passageway for the horses to advance toward the rear of said truck trailer.
The asserted defense rests upon the contention that the acts of Bourgeois were none other than acts of a reasonable and prudent driver and that the accident was an unavoidable one. And further, although it is admitted that Bourgeois did not prior to the time Rhett Plauche fell from his horse, bring his vehicle to a stop, it is expressly denied that the speed of the truck was unreasonable and that the air brakes were released thereby causing an unusual noise. Alternatively, contributory negligence on behalf of Rhett Plauche in several particulars is charged as being imputed to plaintiffs. We think it proper to observe at this point that the trial judge in stating his reasons for judgment, concluded:
“To sum it all up the Court finds-as a fact that the boys were traveling in single file and that in addition to the noises emanating from the steel plates, other unusual noises accompanied the passage of the truck. However, the resolution of these facts is not essential. The proximate and direct cause here was the flagrant— wellnigh deliberate — negligence of the driver, Bourgeois, in not bringing his truck to a full halt and the compounding of that negligence by his inexcusable inattention after the boys went by the cab.”
*300 The manner in which the bridge is constructed has an important bearing upon the issues presented herein. Exclusive of its approaches the bridge is 2,168 feet in length and its floor which is built level with the top of the railroad rails thereon, has a width of 16 feet 9Y2 inches. The ■structure is of concrete, wood and steel and was constructed primarily for railroad use, but provision has also been made to accommodate vehicular traffic and it now constitutes a part of Louisiana Highway No. 1. Four runways over the bridge are provided, consisting of steel plates laid lengthwise to form continuous strips, each approximately three feet in width. These runways accommodate two lanes of travel. The railroad rails are in the center of the bridge, and between the rails and steel plates the floor of the bridge consists of wooden decking. The sides of the bridge are guarded by three lines of three-inch (estimated) pipe placed horizontally and extending to a height of approximately four feet above the floor.
Rhett Matthew Plauche was bom December 31, 1942, and was one of the four children, two boys and two girls, of Dr. J. W. Plauche and his wife, Mrs. Juanita Fryou Plauche of Simmesport. He had completed the seventh grade in school and was a likable child, strong and well developed physically. The horse he was riding was about two and one-half years old and had been ridden by Rhett for approximately one and one-half years. The animal was not shod and was described as gentle. It appears that Rhett and his brother, Winnfield, fifteen months his senior, rode their horses frequently and together. they had previously crossed the bridge 'on horseback some three or four times. Their parents had forbidden them to cross the bridge unless they would dismount and lead their horses. Winnfield admitted disregard of these instructions.
Winnfield Plauche testified that on the morning of Rhett’s death, they had entered the west entrance to the bridge and were about midway of the first span when they observed the truck approaching. The two horses were being walked. At first he could not gauge the speed of the truck but as it got nearer he estimated it was traveling at a speed of from ten to fifteen miles per hour. As the truck came closer he could hear a noise being made as the tires of the truck rolled over the steel plates, and when the horses were within about twenty feet from the truck they got “shy and jumpy”. Winnfield says he then told Rhett to get close to the side rail. The truck passed. He related that when the horses were about midway of the truck it made a hissing sound which frightened Rhett’s horse, thereby causing the horse to jump to the right and rear up on its hind legs with its front feet against the rail; that Rhett fell from his horse and in doing so struck the body of the truck, and when this happened the horse was at the corner of the truck. After Winnfield had observed the condition of his brother, he led his horse back toward the end of the bridge and met his father, who had been informed of the accident.
Russell Bourgeois testified that he had been employed as a truck driver since 1948 and was accustomed to traveling over the bridge. He described his truck as being an International with Fruehauf trailer having a length of forty feet and a width of seven and one-half feet. The truck trailer has four sets of dual wheels and at the time under consideration was loaded. The vehicle is equipped with air brakes which make a noise when the brakes are released, due to air which is emitted underneath and near the middle of the trailer ■where the booster is located. He stated that he had entered the bridge on the eastern side, where the approach is curved and inclined, at a speed of about twenty miles per hour; that he observed the two horses approaching at some distance, whereupon he removed his "foot from the accelerator and thereafter did not apply his air brakes; that when he met the horses his truck' was moving at a speed of from ■ five to seven miles per hour; that *301 the horses were traveling in single file and he did not notice anything unusual in their conduct. After passing the bóys he observed in the rear view mirror Rhett prone upon the bridge and immediately brought his truck to a standstill with the rear end thereof from twenty to thirty feet from the body. He admitted that he was not looking in his rear view mirror at the instant Rhett was falling from his horse.
There were two other motorists on the bridge at the time of the accident. One of these was Alfred Reason who was trailing the truck and proceeding in a westerly direction. The other was Richard J. Lacombe, who was traveling easterly and had entered the bridge some distance behind the horses.
Reason testified that while the horses were some distance away he was trailing the truck at about a fifty yard interval; that as the hor.ses came nearer, the speed of the truck and of his vehicle slowed to a speed of about ten miles per hour, during which time the distance between his automobile and the truck was reduced to about forty-five yards. He said that at no time did he observe the brake lights at the rear of the truck come on and he did not hear any hissing sound such as accompanies the release of air brakes. He further stated that the boys were riding ■abreast when about five or ten feet in front of the truck and he noticed nothing unusual in the conduct of the horses until the trailer had almost cleared the animals. At this point, he said, Rhett’s horse made a jump to the right, reared up, and the ■boy fell over to his left. He did not see either the horse or the boy have contact with the truck. He testified that Bourgeois brought the truck to a stop with the rear of the trailer about eighteen to twenty feet from the boy’s body. Reason immediately stopped his car, went over to where Rhett Plauche lay, observed the boy take a breath, and lie still.
Lacombe testified that when, he came upon the bridge he saw the horses abreast and nearly parallel 'with the truck on the bridge; that he estimated the speed of the truck to be about fifteen miles per hour; and then he noticed the horses súddenly jumping and prancing and saw the boy fall -vMien near the end of the truck. The witness testified he drove up close to the body which was eighteen or twenty feet behind the end of the stopped truck. He then left to obtain an ambulance.
Since the advent of the automobile, the responsibility of motorists when meeting a passing rider on horseback, or a vehicle drawn by animals, has undergone a certain amount of change due to the fact that the animals have more or less become accustomed to the presence and noise of such vehicles; as a consequence thereof the rigor of the law toward the motorist has been relaxed in Louisiana as generally in most states. The rule of conduct now imposed upon a motorist is that he is not required to reduce his speed at all when meeting or passing animal drawn vehicles or mounted horses on the highway unless he observes that the animal or animals are frightened or indicate in some manner that they are disturbed because of his presence. This is to say that a driver must not create any unusual situation, which might cause nervousness or fright in such an animal. At the same time it must be realized that the action of a horse may not always be predicted with certainty. Persons with knowledge of the characteristics and dispositions of horses and who have had experience in handling them, know that regardless of their gentleness they never become absolutely immune from fright. Smith v. Louisiana Power & Light Company, La.App.1935, 158 So. 844; Joyner v. Williams, La.App.1948, 35 So.2d 812. With reference to the mounted horse and its rider, the duty of a motorist is aptly set forth in 60 C.J.S., verbo Motor Vehicles, § 381, p. 935:
“ * * '* He is under a like duty to exercise care with respect to a person riding a horse, and, if he sees *302 or in the exercise of ordinary care should see that the horse is in a fretful and uncontrollable condition, it is his duty to use ordinary care to prevent his vehicle from further frightening the horse or colliding with him, and actually to stop his vehicle rather than to risk the most probable danger of collision by proceeding.”
We must recognize, therefore, that liability may be imposed upon the defendants in this case if the driver,. Russell Bourgeois, through his conduct in passing the horse ridden by Rhett Plauche, created any unusual situation which could and did cause nervousness or fright in the animal.
The important factors which call for close scrutiny are: (1) the creation of an unusual hissing noise in the vicinity of the horse by the release of air brakes; (2) the observation of or opportunity to discover that the conduct of the horse imposed a duty on the driver to stop his vehicle; and (3) the failure of Bourgeois to constantly observe the mounted horses through his rear view mirror as negligence. The first of these three issues must be resolved against the plaintiffs upon whom is imposed the burden of proof. Winnfield Plauche, it is true, testified that he heard a hissing noise and that almost instantly Rhett’s horse suddenly jumped and reared up. On the other hand Bourgeois testified positively that while near the horses he did not apply his brakes or release them. The testimony of the truck driver is strongly corroborated by Reason, who, by reason of being immediately behind the truck, was in a favored position to see the brake lights flash on if the brakes were applied, and to hear the air being expelled if the air brakes had been applied and then released.
We are of the opinion also that it has not been proven Bourgeois owed a duty to stop his truck prior to passing the horses. As stated above, the legal duty to stop is imposed upon a motorist only when he can discover that the animal appears disturbed, fretful or out of control, and that the doing or omission of some act on his part would further aggravate that condition. Again the testimony of Winnfield Plauche is contradicted by that of Bourgeois and Reason. It is logical to accept the testimony of Reason. He was immediately behind the truck and about to encounter or meet the two horses. The situation called for close attention on his part. Reason, in fact, testified he was planning to continue past the horses, following in the wake of the truck at a speed of about ten miles per hour. Lacombc did not testify he observed the horses in an excitable state until they were parallel with the truck. We, therefore, find that plaintiffs have not established the existence of circumstances which imposed upon Bourgeois the duty of bringing his truck to a stop. The evidence does not indicate that the horses were frightened or that there was anything unusual in their conduct until after the horses had passed the cab of the truck.
The third question under discussion arises from the testimony of Bourgeois he did not observe Rhett Plauche fall from his horse while looking into his rear view mirror. We find this not to be an important or pivotal point, but it reflects, we think, that for a fleeting moment or fraction of a second the driver of the truck turned his attention away from the mirror and then back to it. It is conclusively established . that . Bourgeois brought the truck to a standstill thirty feet or less from the body of Rhett Plauche. This, itself, reasonably indicates that Bourgeois could not have affected the condition so suddenly created when and after the horse became frightened. Therefore, this point must be resolved contrary to the contentions of appellees.
The finding of the court herein absolves Russell Bourgeois of any negligent conduct in the operation of the motor vehicle. We are impressed with the fact that upon approaching the two boys on horseback *303 he slowed his motor vehicle to a speed of approximately ten miles per hour or less, which, we think, was entirely reasonable under the circumstances. Modern jurisprudence does not impose the duty upon a motorist to bring his vehicle to a complete stop upon meeting a mounted horse on the highway, except under conditions known or observable to the motorist that could cause or aggravate the fear of the animal. We think the evidence fails entirely to prove that Bourgeois at any time released his air brakes in the proximity of the horses.
For the reasons herein stated, the judgment from which appealed is hereby annulled and set aside and the demands of plaintiffs are rejected at their cost.